IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No. 3:05CR777 |
| Plaintiff | |
| v. | ORDER |
| Paul M. Neumann, | |
| Defendant | |

This is a criminal case in which Paul M. Neumann was charged by way of information with health care fraud and money laundering. Those charges arose from Neumann's ownership and operation of clinics providing chiropractic services in the Toledo, Ohio, area. He signed a binding plea agreement on August 24, 2005, and tendered his plea on September 22, 2005. His plea was accepted on December 12, 2005.

More than ten months later [and more than a year after tendering his plea], Neumann filed a motion to withdraw his plea. He filed his motion shortly after a codefendant, MedBack's lawyer, James Altiere, had been acquitted following a trial on related charges.

Newman asserts that his retained counsel, Jon Richardson and Mark Rotert, failed to provide constitutionally adequate representation with regard to the plea of guilty by: 1) failing adequately to investigate the government's case; 2) not researching applicable defenses; and 3) giving erroneous advice on the right to counsel defense. In addition, he contends that the plea was coerced and not supported by an adequate factual basis.

Following an evidentiary hearing and submission of supplemental briefs, the motion to withdraw the guilty plea is decisional. For the reasons that follow, the motion shall be overruled.

**Background**

When Neumann initially began operating his chiropractic clinics in Northwest Ohio, they were called Affordable Chiropractic. In the 1990s the clinics were operating under the name MedBack Clinics.

Concurrently with the change in name, Neumann hired a medical doctor for each of the firm's several Toledo-area clinics. Thereafter, services rendered by chiropractors' patients were billed at the reimbursement rate applicable for services by medical doctors. This practice was given a veneer of legitimacy by the presence of a doctor at each clinic. The doctor would meet briefly with the patients and confirm that chiropractic treatment was needed. Such treatment was at that point deemed by the defendants to be "incident to medical services," and would thereafter be billed as such to insurance companies and state and federal reimbursing agencies.

Those companies and agencies took a different view of this practice. When questions would be raised, Neumann would send [or have sent] a form letter [the so-called "no chiro" letter] bearing his signature in which the companies and agencies were told that the clinics were not providing chiropractic services.

That statement was false: although some medical services were provided at the clinics, most of what they did was chiropractic. But most of the income from the clinics was fraudulently billed as "incident to medical services."

After the government seized large quantities of records and obtained an indictment from the grand jury, Neumann hired Richardson, a Toledo defense attorney, and Rotert, a Chicago-based health care fraud defense attorney. The attorneys, including Rotert, met on April 26, 2005, with the prosecutor, who laid out the core of the government's evidence, theory, and overall case.

The government proposed a package plea, whereby, in exchange for pleas from Neumann and his brother Timothy Neumann, other potential defendants, including Neumann's wife, Annette Neumann, another brother, Mark Neumann, and a friend, Ronald Loeffler, would not be charged. Avoidance of charge and conviction would enable Annette [a chiropractor] and Mark [a medical doctor] to avoid criminal culpability; in addition, it would also enable them to continue to bill federal reimbursement programs for professional services.

The plea would also preserve Neumann's rather substantial assets from forfeiture.

The government set a deadline of May 21, 2005, for Neumann and his brother to accept or reject its plea offer. If acceptance of the offer were not communicated to the government by then, it would present the case to the grand jury and seek to obtain an indictment against all potential defendants.

### Discussion

Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure provides a defendant may withdraw a guilty plea between its acceptance and sentencing if the defendant can show a fair and just reason for withdrawal. To determine whether the defendant has shown a "fair and just reason," I am to consider: 1) any delay in filing the motion to withdraw plea; 2) the reasons for the delay; 3) whether the defendant has asserted his innocence; 4) the circumstances underlying the plea; 5) the defendant's nature and background; 6) the defendant's prior experience with the criminal justice system; and 7) potential prejudice to the government if the motion to withdraw is granted. *See, e.g.*, *U.S. v. Hyde*, 520 U.S. 670, 671 (1997); *U.S. v. Head*, 927 F.2d 1361, 1375 (6th Cir. 1991).

To show ineffective assistance of counsel with regard to a guilty plea, a defendant must show that counsel's performance fell below an objective standard of reasonableness and resultant

prejudice. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). Prejudice in this context means that, "but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Id*. at 59. Assessment of prejudice takes into consideration the likely outcome at trial. *Id*. Where the defendant alleges that his attorney failed to consider a potential defense, the likelihood that such defense might have led to rejection of a plea offer is part of the determination of prejudice. *Id*.

### 1. Failure to Investigate

The record shows that the government's file was substantially open to counsel. As a practical matter, given the document intensive nature of the government's proof, counsel were amply apprised of the government's evidence and theory. There is no suggestion that counsel failed to acquaint themselves with what was made available to them, or neglected to take what they learned into consideration when counseling acceptance of the government's plea offer.

In addition, the prosecutor identified his most important witnesses for counsel; among these were Sue Cousino, who had actively been involved in MedBack's day-to-day workings and some of the doctors who had worked for MedBack. Counsel could rightly fear what these potential witnesses would say and the effect of their testimony.

The defendant claims that between the April 25, 2007, and a later meeting with Neumann on May 4th, counsel should have, but did not, contact either Neumann or Altiere. Instead, as Rotert acknowledged, he "took the government at its word." In addition, he examined a box of materials that Neumann gave him, and which Neumann had told him were exculpatory evidence. Rotert, on review of these documents, concluded that they would contribute nothing to an effective defense.

I find no fault with what Rotert did to learn about the case against Neumann, and certainly no fault that crosses the line between reasonable and unreasonable professional conduct. He went where he had to go to learn what he had to learn to be able to give his advice about the merits of the proposed plea.

This was a case in which the government believed that it had what colloquially is called a "lay down:" that, no doubt, accounts for its willingness to disclose most of its anticipated evidence. When all the cards are on the table, a defendant can hardly claim – or at least not with any degree of persuasiveness – that his lawyer failed to look for something else to turn over.

The documents, moreover, said what they said. Of critical importance to any lawyer's assessment of what faces his client are documents such as the "no chiro" letter. That letter was not sent once or twice; it was sent routinely, and when sent, bore Neumann's signature.

This was not the first case of this kind handled by Rotert, or the first serious federal case handled by Richardson. Yet the defendant discounts entirely their experience and the role that such experience necessarily played in their exercise of their professional judgment in light of what the government had laid before them and their client.

There is no merit whatsoever to the claim that the defendant's attorneys failed to learn the essential and fundamental facts and evidence that would be presented to the jury.

### 2. Failure Either to Discuss or Provide Advice Accurately re. Available Defenses

The defendant's motion to withdraw his plea was accompanied by Neumann's affidavit, which claimed:

> Mr. Richardson informed me that reliance on counsel is a defense only if a person relies on the advice of counsel that is not employed by the same entity as the person wishing to rely on the defense. . . .

5

> \* \* \* \* \* \* \*
>
> Following that discussion, that defense was never again brought up or discussed in any way. . . . At no time did either Mr. Rotert or Mr. Richardson discuss any possible defenses to this criminal action, . . . .

[Doc. 31-4, ¶¶ 4, 5].

Testimony by Rotert at the evidentiary hearing clearly established that he thoroughly considered and discussed a general good faith defense, a reliance on counsel defense, and a defense based on the defendant's "incident to" billing theory. During his testimony at the evidentiary hearing Neumann acknowledged that he discussed defenses with Rotert.

The government enumerates other instances during his testimony where Neumann changed his story; what matters most, however, and what causes me to discredit entirely Neumann's present depiction of his lawyers' work on his behalf, is the falsity of his statements in the affidavit about defenses not being discussed by his attorneys.

I find their testimony truthful, and that of the defendant not worthy of belief. The plain and simple truth is that he lied: he lied to the court, and, quite possibly, he lied to his present lawyer. That lie, and the other inconsistencies to which the government points, undercuts completely his contention that he plead guilty because he was coerced.

To be sure, early on Richardson gave him erroneous information about the reliance on counsel defense when he said that that defense was not available where the attorney was his employee. But I am convinced beyond any doubt that, well before the time Neumann entered his plea he understood the possible defenses available to him. That at one point one of his attorneys may have said something misleading played no role whatsoever in his decision to plead guilty.

I am also convinced that he understood full well the weaknesses of those defenses, and why pleading guilty was in his best interest, and not just that of his wife, brother Mark and Mr. Loeffler.

Like all defendants who plead guilty, he did so believing that, under all the circumstances, doing so was the best among unattractive and undesirable options.

### 3. Other Claims

There is no merit to the defendant's claim of coercion. "Package deals" are not *per se* improper or improperly coercive. *See Cornett v. Lindamood*, 203 Fed.Appx. 691, 694-95, 2006 WL 3006496, *3-4 (6th Cir.) (Unpublished disposition); *see also U.S. v. Lampazianie*, 251 F.3d 519, 524 (5th Cir. 2001) (responses during plea colloquy re. voluntary nature of plea outweighed claim that package deal was coercive). To be sure, they add a measure of pressure on a defendant – but that pressure is counterbalanced by the greater scope of the benefits. Much more was gained overall than was lost through this plea. Its package nature may have contributed to defendant's decision to accept the offer; but that does not mean that he was coerced into entering his plea.

To the extent that consideration of this and other package deals requires "special care" when the plea is tendered and accepted, *see U.S. v. Carr*, 80 F.3d 413, 416 (10th Cir. 1996), I find that the Magistrate Judge very carefully made certain that the defendant's plea was voluntary.

Likewise, I reject the defendant's contention that there was an inadequate factual basis to sustain a finding that he is, in fact, guilty of the offenses to which he plead guilty. The defendant now complains that the Magistrate Judge called on and allowed the prosecutor to summarize the government's anticipated evidence. When the prosecutor was done, the Magistrate asked, "All right. You fully adopt his statement as accurate?", to which the defendant replied, "Yes."

Then, in response to the Magistrate Judge's further questions, "Mr. Neumann, you are admitting that two or more persons conspired to commit healthcare fraud as alleged in the information and that you are one of those persons?" and 'So that you knew a conspiracy existed and

7

that you knowingly and voluntarily joined that conspiracy and that a member of your conspiracy did one of the overt acts that are set forth in the information in promotion of the conspiracy?", the defendant likewise answered, "Yes."

This sufficed to establish the requisite factual basis on which to conclude that the defendant was, in fact, guilty of the offenses to which he was pleading guilty. *See U.S. v. Baez*, 87 F.3d 805, 809-10 (6th Cir. 1996) (recitation of factual basis in plea agreement, followed by defendant's affirmative acknowledgment of accuracy, sufficient).

### 4. Prejudice

Even if the defendant had shown some deficiency in the work done by his lawyers, he has failed to show prejudice: there would have been little likelihood that he would have been acquitted at trial.

Contrary to his contention, the case against him was stronger – and probably considerably so – than the case against Altiere. Altiere was successfully able to distance himself from the "no chiro" letter at the heart of the defendant's fraudulent practices. Neumann, had he stood trial, would have found it far more difficult, if not impossible, to do so.

Altiere projected the image of an employee, who despite his position as corporate counsel, was out of the loop and unaware of what was going on. Neumann, as an owner and overall boss, would not have been able to project a similar image. The witnesses – Cousino and doctors – who were not able to connect Altiere to how the doctors functioned [i.e., very little] and the clinics' billing practices [riddled with fraud] would have readily been able to make those connections to Neumann.

The government's case was strong; potential defenses, to the extent available at all, were weak and without reasonable hope of success. Trial was not a sensible option.

### 5. Other Factors

Consideration of the factors set forth in *Hyde, supra*, and *Head, supra*, provide further support for finding that no flaw of constitutional dimension or prejudicial consequence affected his plea of guilty.

The timing of the motion is, of course, highly suspect. On learning of Altiere's acquittal, Neumann's imulse to see what could be done on his own behalf is understandable. But if he really thought that he had been coerced, or even suspected that the defenses of which he was aware could and should have been pursued more vigorously, he had from May, 2005, when he told Rotert to tell the government he would plead, to take the step he only took more than eighteen months later.

The delay and timing of the motion to withdraw favor denial.

The same is true with regard to the reasons proffered for the delay [to the extent any have been proffered]: namely, the acquittal of Altiere. While that may account for why the motion was filed, it does not justify granting it. Another's good fortune does not entitle a defendant to a change of heart or mind.

The defendant asserts his innocence. But he also admits the deceit that was at the core of the government's case, and which exposed him to far more severe consequences if he stood trial: namely, the "no chiro" letter. No matter how the defendant [and Alterie's counsel at his trial] rationalize the "no chiro" letter, the simple fact remains that it is deliberately, knowingly, and fraudulently false. And one, moreover, that was repeated over and over and over for pecuniary gain.

9

Altiere's "fingerprints" were not on the letter; or so his attorney was able to suggest, and so the jury appears to have believed.

But Neumann's signature was on the letter, which he admits was deceitful. No matter how much he may profess his innocence, those protestations are neither plausible nor persuasive.

He admitted his guilt when he signed the plea agreement; he repeated it again when he entered his plea; he remained by that admission until Altiere's acquittal.

That acquittal may entitle Altiere to assert his innocence. But it does not make the defendant's late-revived claims of innocence credible, much less sufficient.

The circumstances of the defendant's plea favor rejecting the pending motion. He was well advised to enter the plea. He and his family members and friend benefitted substantially from the plea. He avoided the risk of a much longer potential prison term and forfeiture of his ill-gotten assets. His wife and brother got to continue their professions. On balance, the circumstances of the plea favor rejection of the motion to withdraw.

To be sure, aside from the extensive and protracted criminal conduct to which the defendant plead guilty, he had no prior experience with the criminal justice system. But he is intelligent and well-educated, and fully able to understand and choose among his options.

Finally, the prejudice to the government would be substantial. Much time has passed since its investigation culminated in the execution of search warrants in 2000. To some extent, the passage of time is due to the defendant – certainly his delay of more than a year and a half cannot be disregarded when assessing the likely prejudice to the government.

None of the factors favors granting the motion, which, in any event, is otherwise not well founded on the merits of its allegations of ineffective assistance of counsel.

**Conclusion**

The defendant has shown no good reason to vacate his knowing, intelligent and voluntary plea, which was amply supported by the underlying facts which the government had at hand, and which were known to the defendant.

For the foregoing reasons, it is

ORDERED THAT:

1. The defendant's motion to withdraw his plea of guilty be, and the same hereby is overruled; and

2. The Clerk shall schedule a conference to set a date for sentencing.

So ordered.

s/James G. Carr  
James G. Carr  
Chief Judge